IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 07-00375-01-CR-W-HFS |
| | ) | |
| PAYTON R. PARKS, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

Before the court is Defendant's Motion to Suppress Illegally Obtained Evidence and Statements on grounds that the evidence seized and statements made by Defendant were obtained in violation of the Fourth and Fifth Amendments. Specifically, Defendant challenges the legality of the traffic stop and subsequent search, and seeks to suppress all evidence recovered from the vehicle. Defendant also seeks to suppress all statements made during the course of the encounter.

*I. BACKGROUND*

On March 13, 2007, Johnson County, Missouri Sheriff's Department Deputy Josh Scott observed that the rear license plate of an older white Chevrolet driven by Defendant was not illuminated as required by Missouri statute. Deputy Scott stopped the Chevrolet and asked Defendant to step out of the vehicle. After searching Defendant's person, Deputy Scott placed Defendant in the patrol car and called his license plate into dispatch. While waiting for the results, Deputy Scott requested permission to search the vehicle; Defendant consented. A search of the

1

Chevrolet revealed a firearm and marijuana. Defendant was ultimately arrested and taken to headquarters, where he gave a Mirandized statement.

An indictment was returned on November 13, 2007, charging Defendant with being a felon in possession of a firearm. On May 22, 2008, Defendant filed a Motion to Suppress Illegally Obtained Evidence and Statements (Doc. No. 20). The government responded to Defendant's motion on June 4, 2008 (Doc. No. 23). I conducted an evidentiary hearing on July 1, 2008. The government appeared by Assistant United States Attorney David Barnes. Defendant was present, represented by appointed counsel Anita Burns. The government called Johnson County, Missouri Sheriff's Department Deputy Josh Scott to testify. In addition, the following exhibits were marked and admitted into evidence:

| | |
|---|---|
| Government's Exhibit 1: | Johnson County Sheriff's Department Dispatch Timeline |
| Government's Exhibit 2: | Johnson County Sheriff's Department Miranda Warning and Waiver Form |
| Government's Exhibit 3: | Johnson County Sheriff's Department Incident Report |
| Defendant's Exhibit 1: | Racial Profiling Report Form |
| Defendant's Exhibit 3: | Missouri Revised Statute § 307.075 |
| Defendant's Exhibit 4: | 2007 Johnson County, Missouri Racial Profiling Data |

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1. On March 13, 2007, Johnson County, Missouri Sheriff's Department Deputy Josh Scott was on road patrol (Tr. at 4, 27). He was by himself and did not have a backup officer (Tr. at 6). As Deputy Scott sat stationary in his patrol car in the median of 50 Highway, he observed an

older white Chevrolet at approximately 11:49 p.m. traveling eastbound without an operating license plate light (Tr. at 5-6, 27-28, 29, 30; Gvt. Exh. 1; Gvt. Exh. 3).

    2.       The headlights of the Deputy Scott's patrol car illuminated the Chevrolet as it passed (Tr. at 28). The Chevrolet was less than fifty feet away (Tr. at 29). Deputy Scott noticed the driver was a black male (Tr. at 28). He was not able to read the license plate at that point (Tr. at 28).

    3.       Deputy Scott activated his emergency lights and followed the Chevrolet (Tr. at 4, 6-7). Deputy Scott's headlights illuminated the rear license plate of the vehicle so that he could read the plate (Tr. at 32-33). At approximately 11:50 p.m., he performed a traffic stop just past the intersection of 23 Highway and 50 Highway for the license plate light violation (Tr. at 4, 6-7, 8, 29-30, 33; Gvt. Exh. 1; Gvt. Exh. 3).

    4.       Deputy Scott testified he did not stop the vehicle because the driver was African American (Tr. at 22).

    5.       Defendant was driving the Chevrolet; there was also a passenger in the vehicle (Tr. at 7, 14; Gvt. Exh. 3). Deputy Scott asked both Defendant and the passenger for their driver's licenses (Tr. at 7, 33). He also asked Defendant to step out of the vehicle (Tr. at 7, 34; Gvt. Exh. 3). Based on his training and experience, Deputy Scott feels safer having the driver outside of the vehicle (Tr. at 9, 34).

    6.       Once Defendant was out of the vehicle, Deputy Scott asked for consent to search Defendant's person for officer safety (Tr. at 7, 10, 34-35; Gvt. Exh. 3). Defendant agreed (Tr. at 12; Gvt. Exh. 3). No weapons or contraband were found on Defendant (Tr. at 11-12; Gvt. Exh. 3). Deputy Scott testified he did not ask for consent to search because Defendant was African American (Tr. at 22).

3

7. Deputy Scott then placed Defendant in the front seat of his patrol car (Tr. at 9). Defendant was not in handcuffs (Tr. at 9). There was not a cage or divider between Deputy Scott and Defendant (Tr. at 9). At no point did Deputy Scott tell Defendant he was free to leave (Tr. at 36).

8. Deputy Scott called both Defendant and the passenger's license in to the dispatch officer at approximately 11:53 p.m. (Tr. at 9, 39, 42; Gvt. Exh. 1). Although Deputy Scott watched the Chevrolet where the passenger remained, he did not have his eyes on him the entire time (Tr. at 38-41).

9. While waiting for the results of the license check, Deputy Scott asked Defendant for consent to search the Chevrolet stating, 'Do you mind if I search the car?" (Tr. at 9, 36; Gvt. Exh. 3). Deputy Scott asked for consent within four or five minutes after the traffic stop was initiated (Tr. at 10, 52). Defendant consented to the search (Tr. at 12, 36; Gvt. Exh. 3). Deputy Scott did not inform Defendant he did not have to consent (Tr. at 45). Deputy Scott asked Defendant if there were any drugs, weapons, stolen items, or anything he was not supposed to have in the vehicle; Defendant replied that there was not (Tr. at 37). Deputy Scott testified he did not ask for consent to search because Defendant was African American (Tr. at 22).

10. Both when Deputy Scott asked Defendant to search his person and the vehicle, he did not get the impression that Defendant was mentally impaired, drunk or high (Tr. at 11). Deputy Scott did not threaten, strike, coerce, or make any promises to Defendant to obtain consent (Tr. at 11, 12).

11. Before performing the search, Deputy Scott asked the passenger to exit the Chevrolet

(Tr. at 12). The passenger did so through the driver's side door and stood at the rear of the vehicle (Tr. at 12-13, 42, 45). Deputy Scott began the search by looking under the driver's seat (Tr. at 13; Gvt. Exh. 3). There, completely concealed under the seat, he located a Smith & Wesson pistol; the gun was not chambered, but had a loaded magazine (Tr. at 13, 43; Gvt. Exh. 3). Deputy Smith also located a clear baggie containing tobacco and marijuana in plain view (Tr. at 13-14, 43, 52-53; Gvt. Exh. 3).

12. Deputy Scott testified that the passenger of the vehicle could not have placed the gun or the marijuana under the seat while exiting the vehicle without Deputy Scott seeing him do so (Tr. at 12). When asked about the firearm and marijuana, the passenger stated he knew nothing (Tr. at 44).

13. Deputy Scott ultimately learned Defendant was on probation (Tr. at 41).

14. Based on discovery of the firearm and marijuana, Deputy Scott had dispatch run a criminal history on Defendant (Tr. at 14). He learned that Defendant was a felon (Tr. at 17). Deputy Scott also ran the gun at 12:09 a.m., approximately twenty minutes after the stop was initiated (Tr. at 13-14; Gvt. Exh. 1).

15. Deputy Scott asked Defendant to step out of the patrol car (Tr. at 15). He placed him in handcuffs, informed him he was under arrest for possession of marijuana and unlawful use of a weapon, and placed him back in the front seat of the patrol car (Tr. at 15; Gvt. Exh. 3). The passenger of the Chevrolet was released (Tr. at 16).

16. Deputy Scott gave Defendant a verbal warning rather than a citation for his failure to illuminate the rear license plate of the Chevrolet (Tr. at 46-47).

5

Case 4:07-cr-00375-HFS   Document 35   Filed 07/16/08   Page 5 of 13

17. Deputy Scott transported Defendant to headquarters in Warrensburg, Missouri (Tr. at 16-17; Gvt. Exh. 3). The trip was twelve to fifteen miles and took approximately fifteen minutes (Tr. at 17). At headquarters, Deputy Scott learned Defendant had been convicted on six felony charges (Gvt. Exh. 3).

18. Deputy Scott interviewed Defendant at headquarters (Tr. at 17). The interview took place in an open room at the road patrol office (Tr. at 17). Defendant was not handcuffed (Tr. at 19). There were no other witnesses in the room (Tr. at 49). Before the interview commenced, Defendant was advised of his Miranda rights (Tr. at 18; Gvt. Exh. 2; Gvt. Exh. 3). Defendant waived his Miranda rights at approximately 1:04 a.m. (Tr. at 18-19; Gvt. Exh. 2; Gvt. Exh. 3). Deputy Scott did not have any difficulty communicating with Defendant and Defendant gave no indication that he did not understand what he was doing when he waived his Miranda rights (Tr. at 21). Defendant gave an oral statement (Tr. at 21; Gvt. Exh. 3).

19. Deputy Scott was civil and professional to Defendant throughout the entire encounter (Tr. at 23).

20. On the night of March 13, 2007, besides stopping Defendant, Deputy Scott performed stops on two other vehicles for traffic violations (Tr. at 36).

### III. LEGAL ANALYSIS

Defendant seeks to suppress physical evidence recovered during the consent search of his vehicle. He also seeks to suppress all statements he made during the traffic stop, the search of his vehicle, and the interview at headquarters on the ground that they are "fruit of the poisonous tree."

6

**A.     PHYSICAL EVIDENCE**

Defendant contends that the firearm and marijuana recovered from the vehicle should be suppressed on three alternate grounds. He argues that: (1) Officer Scott lacked probable cause to conduct the traffic stop; (2) even if the stop was lawful, it was unjustifiably prolonged; and (3) his consent to search the vehicle was not voluntarily given. Each argument will be addressed in turn.

**1.     Probable Cause**

Defendant first challenges whether probable cause existed to stop the vehicle. "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation." United States v. Coney, 456 F.3d 850, 855-56 (8th Cir. 2006)(citing United States v. Brown, 345 F.3d 574, 578 (8th Cir. 2003)); see also United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008); United States v. Williams, 431 F.3d 296, 298 (8th Cir. 2005); United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002). "As long as an officer 'objectively has a reasonable basis for believing that the driver has breached a traffic law,' the officer has probable case to conduct a traffic stop." Coney, 456 F.3d at 856 (quoting United States v. Thomas, 93 F.3d 479, 485 (8th Cir. 1996)).

Defendant argues that the stop was not based on an observed traffic violation but was, instead, motivated by other factors. The facts do not support this argument. As set forth in Missouri Revised Statute Section 307.075,[1] failure to illuminate a vehicle's rear license plate is a traffic

---

[1] Section 307.075(1) reads, in pertinent part:
Every motor vehicle . . . shall be equipped with at least two rear lamps, . . . which when lighted will exhibit a red light plainly visible from a distance of five hundred feet to the rear. Either such rear lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration marker and render it clearly legible from a distance of fifty feet to the rear.

7

violation. Here, Deputy Scott testified he observed the Chevrolet traveling eastbound on 50 Highway without an operating license plate light. He further testified he did not stop the vehicle because the driver was African American. Because Deputy Scott personally observed the unilluminated plate, he had a reasonable basis for believing Defendant breached Section 307.075 and thus had probable cause to perform the stop.

### 2. Length of Traffic Stop

Having determined that the traffic stop was lawful, the court must next consider whether the stop was unjustifiably prolonged. "The Fourth Amendment grants an officer conducting a routine traffic stop latitude to check the driver's identification and vehicle registration, ask the driver to step out of his vehicle and over to the police car, inquire into the driver's destination and purpose for the trip, and 'undertake similar questioning of the vehicle's occupants to verify the information provided by the driver.'" Gregory, 302 F.3d at 809 (quoting United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002)); see also United States v. Allegree, 175 F.3d 648 650 (8th Cir. 1999)(stating reasonable investigation following a lawful traffic stop may include, inter alia, asking the driver to sit in the patrol car); United States v. White, 81 F.3d 775, 778 (8th Cir. 1996). Subsequent to a lawful traffic stop, an officer "may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history." United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999). "During this process, the officer may ask the motorist . . . whether the officer may search the vehicle." Id.; see also United States v. Beatty, 170 F.3d 811, 813 (8th Cir. 1999); United States v. Randall, 211 F. Supp. 2d 1127, 1133 (D. Neb. 2001). A lawful traffic stop can become unlawful, however, "'if it is prolonged beyond the time reasonably

8

required to complete' its purpose." Peralez, 526 F.3d at 1119 (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)). Whether the stop was reasonable in length "is a fact intensive question, and there is no per se time limit." Id. (quoting United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007)).

Here, Deputy Scott observed the traffic violation at 11:49 p.m. and conducted the stop at 11:50 p.m. He asked Defendant and the passenger for their driver's licenses and asked Defendant to step out of the car. Deputy Scott then asked for consent to search Defendant's person, to which Defendant agreed. No weapons or contraband were found, so Deputy Scott placed Defendant in the patrol car. At 11:53 p.m., Deputy Scott called the driver's licenses into dispatch. While waiting for the results, Deputy Scott asked Defendant for consent to search the vehicle. This event occurred four or five minutes after the traffic stop was initiated. After receiving consent, Deputy Scott returned to the Chevrolet, asked the passenger to exit the vehicle, performed the search, recovered the firearm and marijuana, and returned to his patrol car. At 12:09 a.m., Deputy Scott called the firearm into dispatch.

Upon learning from dispatch that Defendant was a felon, Deputy Scott asked Defendant to exit the patrol car, handcuffed and placed Defendant under arrest, and returned Defendant back to the patrol car. He released the passenger of the Chevrolet. Deputy Scott then transported Defendant for twelve to fifteen miles to headquarters. At headquarters, Deputy Scott unhandcuffed Defendant and advised him of his Miranda rights. Defendant waived his rights at approximately 1:04 a.m. and gave an oral statement.

The above facts reveal that Deputy Scott performed the traffic stop in a timely fashion. He called both Defendant and the passenger's driver's licences into dispatch within three minutes after
9

the stop was initiated. Defendant gave Deputy Scott consent to search the vehicle one or two minutes later and, notably, before the traffic stop was complete. Deputy Scott then performed the search, recovered the firearm and marijuana, and called the firearm into dispatch within sixteen minutes of obtaining consent and within twenty minutes of the initial stop. I, therefore, find that the traffic stop was not unjustifiably prolonged.

### 3. Consent to Search

"A consensual search does not violate the Forth Amendment if the consent was given voluntarily and without coercion." United States v. Meza-Gonzalez, 394 F.3d 587, 592 (8th Cir. 2005). The burden falls on the government to prove by a preponderance of the evidence that consent was voluntary. Id. Consent is measured by a standard of objective reasonableness, focusing on "what the typical reasonable person would have understood from the exchange with the officer." Id.

Consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker," rather than the "product of duress or coercion, express or implied." Schneckloth v. Bustamonte, 412 U.S. 218, 225, 227 (1973). The voluntariness of consent is a "question of fact to be determined from the totality of all the circumstances." Id. at 227; see also United States v. Urbina, 431 F.3d 305, 309 (8th Cir. 2005). Courts consider both the characteristics of the person giving consent as well as the environment in which consent was given when assessing voluntariness. See Urbina, 431 F.3d at 309.

Personal characteristics relevant in determining whether voluntary consent was given include:

> (1) his age; (2) his general intelligence and education; (3) whether he was intoxicated or under the influence of drugs when he consented; (4) whether he consented after

being informed of his right to withhold consent or of his <u>Miranda</u> rights; and (5) whether, because he had been previously arrested, he was aware of the protections afforded to suspected criminals by the legal system.

<u>Id</u>. (<u>citing</u> <u>United States v. Chaidez</u>, 906 F.2d 377, 381 (8th Cir. 1990)). Factors considered in analyzing the environment in which consent was given include whether the individual:

> (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

Urbina, 431 F.3d at 309 (citing <u>Chaidez</u>, 906 F.2d 381). These factors "should not be applied mechanically, and no single factor is dispositive or controlling." United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000) (citation omitted).

In this case, the totality of the circumstances demonstrate that Defendant's consent was voluntarily given. Defendant's personal characteristics do not indicate his consent was the product of duress or coercion. Deputy Scott testified he did not believe Defendant to be mentally impaired, drunk, or high. Defendant had been convicted of six felonies, so had an increased awareness of the protections of the legal system. Although Deputy Scott did not advise Defendant of his right to withhold consent, this factor is not determinative, <u>see</u> <u>Schneckloth</u>, 412 U.S. at 231-233, since all the other factors indicate Defendant's consent was voluntary.

Similarly, the environment in which Defendant gave Deputy Scott consent to search the vehicle demonstrates consent was voluntarily given. Defendant gave consent within four or five minutes of the stop. Deputy Scott did not threaten, strike, coerce, or make any promises to Defendant to obtain consent; to the contrary, Deputy Scott was civil and professional. Defendant was neither handcuffed nor under arrest when he gave consent. He was not in a secluded place. <u>See</u>

11

United States v. Mancias, 350 F.3d 800, 806 (8th Cir. 2003)(finding consent was voluntarily given when the traffic stop occurred after midnight and the defendant was seated in the back seat of the patrol car and handcuffed). There is no evidence that Defendant objected during the course of the search. I, therefore, find that Defendant's consent for Deputy Scott to search the vehicle was voluntarily given.[2]

### *Statements*

Defendant argues that any statements he made during the stop, search and subsequent interview should be suppressed as "fruit of the poisonous tree" (Tr. at 2-3).[3] Because, under the above analysis, neither the stop nor search violated the Fourth Amendment, any statements obtained from Defendant should not be suppressed as "fruit of the poisonous tree."

For the above-stated reasons, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying Defendant's Motion to Suppress Illegally Obtained Evidence and Statements. Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

---

[2] Because Defendant was not illegally detained, it is unnecessary to consider whether Defendant's consent purged the taint of such detention.

[3] Defendant conceded at the suppression hearing that he was not making a Fifth Amendment challenge to the adequacy of Miranda warnings or voluntariness of his statements (Tr. at 2-3).

12

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 16, 2007

13